Filed 12/11/25  P. v. Sweitzer CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C101580 |
| v. | (Super. Ct. No. 96F05553) |
| JOSHUA DOUGLAS SWEITZER, | |
| Defendant and Appellant. | |

In July 1996, defendant Joshua Douglas Sweitzer participated in a crime spree that culminated in an attempted carjacking, the murder of Timothy Tallman, and the attempted murder of R.T.  A jury convicted defendant of various offenses committed during the crime spree, including attempted carjacking, special circumstance murder, and attempted

murder. The trial court sentenced defendant to state prison for life without the possibility of parole plus 16 years.

In April 2022, defendant filed a petition to vacate his murder and attempted murder convictions under Penal Code section 1172.6.[1] After issuing an order to show cause and holding an evidentiary hearing, during which the prosecution relied on the record from the underlying trial, the trial court denied the petition.

Defendant now contends (1) there is insufficient evidence to support the trial court's findings that he committed felony murder as a major participant who acted with reckless indifference to human life, directly aided and abetted an implied malice murder, and directly aided and abetted an attempted murder with the intent to kill; (2) the trial court's denial of his resentencing petition is precluded by the jury's finding that he did not intend to kill Tallman; and (3) the trial court violated section 1172.6 and principles of double jeopardy by finding that he aided and abetted an implied malice murder even though that theory was not presented at his original trial.[2]

Finding no merit in the contentions, we will affirm the trial court's order denying the petition.

BACKGROUND

Defendant was 19 years old on July 14, 1996, when he drove David Ellis and another individual, C.E., in defendant's pickup truck. The record does not reveal Ellis's

---

[1] Undesignated statutory references are to the Penal Code. Defendant's petition was filed under former section 1170.95. Effective June 30, 2022, that section was renumbered section 1172.6 without change to the text. (Stats. 2022, ch. 58, § 10.) We will refer to the current statute.

[2] Defendant also asserts that the evidence is insufficient to support other theories of liability not relied upon by the trial court in denying his section 1172.6 petition. Because we conclude the evidence supports the findings made by the trial court, we need not address this assertion.

age, but he appears to have been a young adult. C.E. was a minor at the time. She was present for much of the crime spree, but her involvement was minimal.

Defendant, Ellis, and C.E. drove to Bryan Lutz's house to collect a small debt, but Lutz did not answer the door. They then drove to Matthew Braden's house. Braden knew defendant but not Ellis. Defendant told Braden that Ellis wanted to buy a gun that Braden owned, a Tec-9 semiautomatic handgun. Braden said a potential buyer had offered him $450 for the gun, but he would sell it to Ellis if he matched the price. Ellis offered to trade him rims or stereo equipment for the gun. Braden said he would accept stereo equipment or $450 in cash. Defendant asked Braden if he wanted to come with them to visit a few friends, including Lutz, whom Braden also knew. Braden agreed to join them.

The four individuals left Braden's house in defendant's truck. Defendant drove, C.E. sat in the passenger seat, and Ellis and Braden were in the truck bed. After stopping by a couple of houses, they went to an auto parts store. Ellis went inside and bought a "dent puller," the purpose of which was to steal a car. They then drove back to Lutz's house. Lutz told them to come back later, causing Ellis to kick the door and threaten to hurt him if he did not let them in. Lutz eventually paid them the money he owed.

Back at defendant's truck, Braden took over driving and defendant and Ellis got in the truck bed. While driving down the street, they saw a young man on a mountain bike. After making a U-turn, defendant's truck pulled up in front of the young man. Defendant and Ellis jumped out of the truck bed and told him to get off the bike. The young man tried to ride away, but defendant chased him on foot, grabbed him by the shirt, and pulled him to the ground. Defendant and Ellis hit and kicked him while he was on the ground trying to hold onto the bike. After pulling the bike away from the young man, defendant threw it in the back of the truck.

Their next stop was Braden's house, where they dropped off the bike and picked up the gun that Ellis wanted to buy. From there, they drove to a gas station. Ellis got into

a fist fight with someone at the gas station and chased him into the street. Defendant punched another man who tried to intervene. They then drove to a school with a large field because Ellis wanted to test fire the gun. Braden showed Ellis how to disengage the safety and fire the weapon.

From there, the four individuals drove around and ended up at an apartment complex. Defendant got out with Ellis, who had the dent puller and a backpack containing the gun. Defendant asked Braden to drive his truck. Ellis said: " 'We're going to go get a car.' " Defendant and Ellis walked into the apartment complex on foot and came out driving a stolen gold Mazda. Braden and C.E. followed the Mazda in defendant's truck. While driving away from the apartment complex, Ellis fired the gun at another car on the road. They went to a house at the end of a cul-de-sac. When Braden pulled up, defendant asked him to get gas for his truck while he talked to the people at the house. Defendant told Braden where to meet him.

When Braden and C.E. drove off in defendant's truck to get gas, defendant and Ellis drove to Brian B.'s house to "shoot it up." Ellis had talked about doing so earlier in the night. Brian B., his mother, and others were home at the time. Brian B.'s mother heard five or six gunshots in quick succession. She dropped to the floor in the living room, crawled to the kitchen, and called 911. She then went upstairs to check on her son, who was watching a video with his girlfriend and another couple when the shots were fired. She found shattered windows, and bullet holes in walls and other items. No one at the house was hit by the bullets.

After the drive-by shooting, defendant and Ellis met Braden and C.E. at the appointed location. From there, they drove to C.E.'s house and dropped her off. They then went to defendant's house. His uncle had paged him to get home because it was past his curfew. Defendant went inside, but told Ellis and Braden to wait for him to come back out. They drove the stolen Mazda down the street and then walked back to defendant's house to wait. Defendant came back out about 30 minutes later.

4

The three individuals drove off in the Mazda. Defendant was driving, Ellis was in the front passenger seat, and Braden was in the back. Ellis had the gun. At a fast food restaurant, they saw Tallman's Honda Accord and noticed that it had nice rims. Defendant started following the Accord. Tallman noticed that he was being followed and asked R.T. to lock the door. Their two small children were in the back seat of the car.

Ellis directed defendant to catch up to the Accord. Defendant did so, pulling alongside the driver's side of the Accord. Ellis leaned out of the passenger side window with the gun and said: " 'Get the fuck out of your car.' " Ellis fired immediately after he said that. The bullet went through the driver's side door and hit Tallman in the chest. Tallman accelerated to lose the pursuers, but ended up on a curb. Defendant again pulled up beside the Accord, and Ellis fired a second shot into the car, hitting the passenger side window frame and shattering that window. R.T. was not hit by the bullet, but Tallman died from his bullet wound.

Defendant and his cohorts drove back to Braden's house. We need not recount their subsequent activities, except that defendant and Ellis ended up back at Lutz's house sometime after midnight. Ellis told Lutz they did something "pretty big" and were "going to be on TV." Ellis told Lutz about the robbery of the young man on the bike and the subsequent auto theft from the apartment complex. He also told Lutz about the drive-by shooting at Brian B.'s house. Ellis said that he saw a person, who he thought was Brian B., sitting in an upstairs room watching television, so he "aimed at the second story of the house at the person's head." Ellis also told Lutz about the drive-by shooting of Tallman's car. Ellis said the car had "real nice rims," so they pulled up beside it, at which point Ellis leaned out of the passenger side window with the gun and told the driver: " 'Bitch, pull over right now.' " Ellis told Lutz that he thought he killed both the driver and the passenger. Defendant told Lutz he did not know Ellis was going to shoot into Tallman's car. However, both defendant and Ellis "acted like they didn't really care."

5

Defendant described his cohort as " 'fucking gangsters' " and said, " 'that's what happens when you fuck with some G's.' "

## DISCUSSION

### I

Defendant contends there is insufficient evidence to support the trial court's findings that he (A) committed felony murder as a major participant who acted with reckless indifference to human life, (B) directly aided and abetted an implied malice murder, and (C) directly aided and abetted an attempted murder with the intent to kill.

### A

We begin with defendant's argument that there is insufficient evidence to support the trial court's finding that he committed felony murder as a major participant who acted with reckless indifference to human life.

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Section 189 describes a number of unlawful killings that are statutorily defined as "murder of the first degree," including a killing "committed in the perpetration of, or attempt to perpetrate, [certain listed felonies, including] carjacking." (§ 189, subd. (a).) This form of first degree murder, known as first degree felony murder, does not require malice. Prior to Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437), " 'the only criminal intent required [was] the specific intent to commit the particular felony.' " (*People v. Dillon* (1983) 34 Cal.3d 441, 475.)

Effective January 1, 2019, Senate Bill 1437 amended the felony-murder rule to provide, in relevant part: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder

6

in the first degree.  [¶]  (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life . . . ."  (§ 189, subd. (e).)

Here, defendant was charged with murder based, in part, on a felony-murder theory.  He was not the actual killer.  The evidence conclusively establishes that Ellis fired the fatal shots.  And there is no evidence that defendant intended for Ellis to kill Tallman.  Thus, in order to affirm the trial court's order denying defendant's resentencing petition on the basis of felony murder, there must be substantial evidence that defendant was a major participant in the attempted carjacking and that he acted with reckless indifference to human life.

"The principles of substantial evidence review are well settled.  'Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for " 'substantial evidence—that is, evidence which is reasonable, credible, and of solid value' " that would support a finding beyond a reasonable doubt.'  [Citation.]  We must 'review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt.  [Citation.]  . . .  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence.  [Citation.]  "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." '  [Citation.]"  (*People v. Montanez* (2023) 91 Cal.App.5th 245, 270.)

The major participation and reckless indifference requirements contained in section 190.2, subdivision (d), and incorporated into the felony-murder rule by Senate Bill 1437, "codify the holding of *Tison v. Arizona* (1987) 481 U.S. 137, which articulates the constitutional limits on executing felony murderers who did not personally kill.

7

*Tison* and a prior decision on which it is based, *Enmund v. Florida* (1982) 458 U.S. 782, collectively place conduct on a spectrum, with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions." (*People v. Banks* (2015) 61 Cal.4th 788, 794 (*Banks*).)

At one end of the spectrum is a defendant like Enmund, who planned and participated, as the getaway driver, in an armed robbery that resulted in the unplanned murder of the robbery victim and his wife. The court in *Enmund* "found a broad consensus against imposing death in cases 'where the defendant did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder.' [Citation.]" (*Banks, supra*, 61 Cal.4th at p. 799.) At the other end of the spectrum are "actual killers and those who attempted or intended to kill." (*Id*. at p. 800.) In between these extremes, but falling on the permissible side of the constitutional line, are defendants like the Tison brothers, who "helped plan and carry out the escape of two convicted murderers from prison," including their father who "was serving a life sentence for killing a guard in the course of a previous escape." (*Id*. at p. 802.) The Tison brothers brought "a cache of weapons to prison, arm[ed] both murderers, and [held] at gunpoint guards and visitors alike." (*Ibid*.) During their subsequent escape, they carjacked and kidnapped a family of four, took the family's possessions, and the convicted murderers "then killed all four family members." (*Id*. at p. 799.) Although the Tison brothers did not kill or intend to kill, their " 'major participation in the felony committed, combined with reckless indifference to human life, [was] sufficient to satisfy the *Enmund* culpability requirement.' [Citation.]" (*Id*. at p. 800.)

Elaborating on the major participation requirement, the California Supreme Court stated: "Among those factors that distinguish the Tisons from Enmund . . . are these: What role did the defendant have in planning the criminal enterprise that led to one or

more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?  No one of these considerations is necessary, nor is any one of them necessarily sufficient.  All may be weighed in determining the ultimate question, whether the defendant's participation . . . was sufficiently significant to be considered 'major' [citations]."  (*Banks, supra*, 61 Cal.4th at p. 803, fn. 5 omitted.)

Elaborating on the reckless indifference requirement, the Supreme Court explained that " '[r]eckless indifference to human life is "implicit in knowingly engaging in criminal activities known to carry a grave risk of death." ' [Citation.]"  (*People v. Emanuel* (2025) 17 Cal.5th 867, 883 (*Emanuel*).)  "The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create."  (*Banks, supra*, 61 Cal.4th at p. 801.)  Moreover, the major participation and reckless indifference elements are interrelated such that " 'the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' "  (*People v. Clark* (2016) 63 Cal.4th 522, 614 (*Clark*), quoting *Tison v. Arizona, supra*, 481 U.S. at p. 153.)  However, even significant participation does not necessarily entail possession of the requisite mental state.  (*Clark*, at p. 617.)  Instead, reckless indifference " 'encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions.' [Citation.]"  (*Emanuel,* at p. 883.)

In determining whether defendant acted with reckless indifference, "[w]e analyze the totality of the circumstances" using the following factors:  "Did the defendant use or

9

know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*In re Scoggins* (2020) 9 Cal.5th 667, 677; see *Emanuel, supra*, 17 Cal.5th at pp. 884-885.)

With the foregoing factors in mind, we conclude the evidence in this case is sufficient to support the trial court's finding that defendant was a major participant who acted with reckless indifference to human life.

Beginning with major participation, although there is no evidence defendant planned the attempted carjacking that ended Tallman's life, he was present when Ellis negotiated the purchase of Braden's gun, during which Ellis offered to pay for the weapon with either car rims or stereo equipment. According to C.E., it was clear to her that Ellis was referring to "jacking" (stealing) the rims to pay for the gun. Substantial evidence also supports a conclusion that defendant knew Ellis intended to steal a car and use the stolen car to carry out a drive-by shooting of Brian B.'s house. Indeed, Ellis was talking about "shoot[ing] up" the house earlier in the night. Thus, the evidence supports a conclusion that defendant participated in all of that night's events with full knowledge that Ellis intended to use a gun both to rob people and to shoot at an occupied house. Defendant's role in supplying the weapon also cuts in favor of a finding of major participation. Again, he brought Ellis and Braden together to facilitate Ellis's access to the gun. Defendant was also aware of the particular danger posed by Ellis when he drove the stolen Mazda alongside Tallman's Accord. At that point, Ellis had already shot at another car on the street and also at Brian B.'s house with several people inside. Defendant was present at the scene of the killing, seated next to Ellis when Ellis fired the

10

fatal shots. Defendant later told Lutz he did not know Ellis was going to shoot at the car, but defendant registered no complaint when Ellis did so. Defendant continued following Tallman's car to place Ellis in a position to fire a second shot into the car. And after the murder, defendant remained with Ellis and told Lutz, " 'that's what happens when you fuck with some G's.' " The evidence strongly supports the trial court's conclusion that defendant's participation was significant enough "to be considered 'major' [citations]." (*Banks, supra*, 61 Cal.4th at p. 803.)

Turning to reckless indifference, defendant must have known that a gun would be used during the attempted carjacking. Again, Ellis had already used that gun earlier in the night, including to commit a drive-by shooting of Brian B.'s house. Although only one gun was used, and not by defendant, defendant was the one who facilitated Ellis's access to the gun. He also drove Ellis into position alongside Tallman's car so that Ellis could use the gun. Defendant was present at the scene of the murder. Although he claimed he did not know Ellis was going to shoot into Tallman's car, defendant knew about Ellis's propensity for violence when defendant twice placed Ellis in the position to commit violence. Moreover, although the duration of the interaction was short, that was only because Ellis opened fire, not because of any planned brevity or attempt on defendant's part to limit the potential for violence. After the murder, defendant and Ellis "acted like they didn't really care." Defendant specifically bragged about being " 'fucking gangsters.' " Viewed together, these factors strongly support the trial court's conclusion that defendant possessed "a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if [he did] not specifically desire that death as the outcome of his actions." (*Clark, supra*, 63 Cal.4th at pp. 616-617.)

Defendant weighs the factors differently. We need not describe defendant's view of each factor, but we do address one of his assertions. Acknowledging the drive-by shooting of Brian B.'s house prior to the murder, defendant claims it was done "to scare others and not to cause death." Although Ellis later told Lutz that Ellis had tried to shoot

11

Brian B. in the head, defendant argues such an intent would not have been apparent to defendant at the time Ellis shot at the house.  According to defendant, the fact that Ellis said earlier "he wanted to 'shoot up the house' " would not have indicated to defendant that Ellis wanted to kill anyone.  Defendant argues that for him to have acted with reckless indifference, the evidence must show he knew Ellis intended to kill.  Defendant claims the reckless indifference standard "is tantamount to [defendant] actually intending to kill."

Reckless indifference encompasses an awareness of, and willing involvement in, "the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death [the defendant's] actions create."  (*Banks, supra*, 61 Cal.4th at p. 801.)  This means "a willingness to kill (or to assist another in killing) to achieve a distinct aim, *even if the defendant does not specifically desire that death as the outcome of his actions*."  (*Clark, supra*, 63 Cal.4th at pp. 616-617, italics added.)  This standard is not tantamount to express malice.  One important factor in deciding whether defendant was aware of, and willingly involved in, the violent manner in which this particular attempted carjacking was carried out is whether he knew that Ellis had a "propensity for violence or likelihood of using lethal force."  (*In re Scoggins, supra*, 9 Cal.5th at p. 677.)  Seeing Ellis commit a drive-by shooting of an occupied house earlier in the night would have given defendant knowledge of Ellis's propensity for violence and likelihood of using lethal force.  This factor strongly weighs in favor of a finding of reckless indifference.

Defendant also takes issue with certain aspects of the trial court's reasoning, accusing the trial court of making "analytical errors in evaluating the *Banks*/*Clark* factors."  However, we review the trial court's ruling, not its reasoning.  (See *People v. Brooks* (2017) 3 Cal.5th 1, 39.)  We therefore need not go through how the trial court weighed each factor.  For reasons already expressed, the evidence is more than sufficient

to support the trial court's ruling that defendant was a major participant who acted with reckless indifference to human life.

As defendant observes, his youth at the time of the offense is a relevant consideration. (See *People v. Ramirez* (2021) 71 Cal.App.5th 970, 990-991; *In re Moore* (2021) 68 Cal.App.5th 434, 454 ["viewed from the lens of Moore's youth," the court could not "conclude beyond a reasonable doubt that Moore was subjectively aware that his actions created a graver risk of death than any other armed robbery"].) The trial court considered defendant's youth and concluded that although he was 19 years old at the time of the murder, there was no evidence he lacked experience, perspective, or judgment, or that he was sufficiently vulnerable to peer pressure to preclude a finding of reckless indifference. We agree with that assessment. Even viewed through the lens of defendant's youth, the factors discussed above remain sufficient to support the trial court's ruling.

B

We turn to defendant's argument that there is insufficient evidence to support the trial court's finding that he directly aided and abetted an implied malice murder. Although it is not necessary to address this argument, given that we have already concluded defendant could "presently be convicted of murder" notwithstanding the changes made to the murder statutes by Senate Bill 1437 (§ 1172.6, subd. (a)(3)) because defendant committed felony murder as "a major participant in the underlying felony and acted with reckless indifference to human life" (§ 189, subd. (e)(3)), sufficient evidence nevertheless supports the finding that defendant directly aided and abetted an implied malice murder.

Notwithstanding Senate Bill 1437's elimination of the natural and probable consequences doctrine, direct aiding and abetting of an implied malice murder remains a valid theory of murder liability. (*People v. Reyes* (2023) 14 Cal.5th 981, 990 (*Reyes*).) " '[D]irect aiding and abetting is based on the combined actus reus of the participants

13

and the aider and abettor's own mens rea. [Citation.] In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' [Citations.]" (*Id*. at pp. 990-991.) "The relevant act is the act that proximately causes death." (*People v. Powell* (2021) 63 Cal.App.5th 689, 713, fn. 27.)

Here, Ellis's life-endangering act was firing his Tec-9 handgun into Tallman's car. Defendant aided and abetted the commission of that act by driving Ellis into position alongside Tallman's car, enabling Ellis to do so. That satisfies the actus reus component. As for mens rea, the trial court could reasonably have concluded beyond a reasonable doubt that defendant knew Ellis intended to fire at Tallman's car, intended to aid him in doing so, knew that firing into an occupied vehicle was dangerous to human life, and nevertheless drove Ellis into position in conscious disregard for human life. (See *Reyes*, *supra*, 14 Cal.5th at pp. 990-991 [setting forth the requisite mens rea].) As stated previously, defendant knew that Ellis was armed, knew that Ellis fired multiple rounds into an occupied house earlier in the night, and knew that he also shot at least one round at another vehicle while they drove together. Although the ultimate goal was to take Tallman's car to obtain the rims, the trial court could reasonably have inferred that defendant knew Ellis intended to shoot at the car to effectuate the carjacking. Indeed, such a conclusion is bolstered by the fact that defendant again pulled the stolen car alongside Tallman's car even after Ellis fired the fatal shot, allowing Ellis to fire another round into the car. Defendant clearly knew Ellis's intent at that point and did not hesitate

14

to facilitate the second shot.  Defendant then bragged about being " 'fucking gangsters.' " From all of this, the trial court could reasonably have found that defendant was aware of Ellis's intent to fire at the car all along and placed him in position to do so in conscious disregard for human life.  (See *People v. Chun* (2009) 45 Cal.4th 1172, 1205 [willfully shooting at an occupied vehicle, either directly or as an aider and abettor, necessarily involves conscious disregard for human life].)

C

Defendant further claims the evidence is insufficient to support the trial court's finding that he directly aided and abetted an *attempted* murder with the intent to kill.

"Direct aiding and abetting remains a valid theory of attempted murder."  (*People v. Coley* (2022) 77 Cal.App.5th 539, 548.)  " 'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citations.]" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.) As we explained in connection with aiding and abetting an implied malice murder, " '[d]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea.' [Citation.]" (*Reyes, supra*, 14 Cal.5th at pp. 990-991.)  In the context of attempted murder, the actus reus required of the perpetrator is the commission of a direct but ineffectual act toward accomplishing the intended killing.  For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of that direct but ineffectual act.  The mens rea, which must be personally harbored by the direct aider and abettor, is express malice, i.e., a desire for the victim's death or knowledge that the victim's death is substantially certain to occur. (*Id*. at p. 991 [aiding and abetting requirements]; *Covarrubias*, at p. 890 [attempted murder elements].)

Here, after firing the fatal shot that struck Tallman, Ellis fired a second shot into Tallman's car.  R.T. was seated next to Tallman in the front passenger seat, directly in Ellis's line of fire.  Defendant does not dispute that Ellis's actions amounted to attempted

15

murder. " 'The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill. . . ." [Citation.]' " (*People v. Smith* (2005) 37 Cal.4th 733, 741.) With respect to defendant's liability as an aider and abettor, he drove Ellis into position to fire the second shot, aiding Ellis's direct but ineffectual act toward killing R.T., satisfying the actus reus requirement. Turning to defendant's mens rea, regardless of whether he shared Ellis's intent to kill when he initially drove the stolen car alongside Tallman's car, resulting in the fatal first shot, the trial court could reasonably have found that Ellis's act of firing into the car, with two occupants in the line of fire, would have supplied defendant with knowledge of Ellis's intent to kill. And defendant's act of driving Ellis into position to fire the second shot, after Ellis made his intent to kill known, supports a reasonable inference that he shared Ellis's intent to kill. Moreover, as the People accurately observe, "[a]ny uncertainty about whether [defendant] shared [Ellis's] intent is dispelled by what he said afterwards: 'That's what happens when you fuck with some G's.' "

## II

Defendant further asserts that the trial court's denial of his resentencing petition is precluded by the jury's finding that he did not intend to kill Tallman. As defendant correctly observes, in relation to the murder count, the jury found not true the following special circumstance allegation: "the murder . . . was committed by said defendant by means of discharging a firearm from a motor vehicle, intentionally at another person outside the vehicle, with the intent to inflict death . . . ."

However, the fact that the jury apparently found that defendant did not possess the intent to kill Tallman at the time the fatal first shot was fired does not preclude the trial court from finding that defendant could nevertheless be convicted of Tallman's murder, either as a major participant in the underlying attempted carjacking who acted with reckless indifference to human life, or as a direct aider and abettor in an implied malice

16

murder. This is because neither felony murder nor aiding and abetting an implied malice murder requires an intent to kill. Moreover, the prior jury finding regarding defendant's intent to kill Tallman did not preclude the trial court from finding that defendant directly aided and abetted the attempted murder of R.T. with the intent to kill her. For reasons already stated, the trial court could reasonably have found beyond a reasonable doubt that defendant possessed express malice when he aided and abetted the attempted murder.

III

Defendant further contends the trial court violated section 1172.6 and principles of double jeopardy by finding that he aided and abetted an implied malice murder even though that theory was not presented at his original trial.

The argument has been rejected by the Second Appellate District in *People v. Schell* (2022) 84 Cal.App.5th 437. There, the court held that section 1172.6 "allow[s] the prosecution to present different theories of guilt at the evidentiary hearing" than those presented at the original trial. (*Id*. at p. 444.) Such an interpretation of the statute "does not implicate double jeopardy concerns" (*ibid*) because section 1172.6 " ' "involves a resentencing procedure, not a new prosecution." [Citation.] The retroactive relief provided by section [1172.6] is a legislative "act of lenity" intended to give defendants serving otherwise final sentences the benefit of ameliorative changes to applicable criminal laws and does not result in a new trial or increased punishment that could implicate the double jeopardy clause.' [Citation.]" (*People v. Flint* (2022) 75 Cal.App.5th 607, 618.)

But even if the trial court erred in this regard, its decision to deny defendant's petition remains supported by its separate and independent determination that defendant could presently be convicted of murder under a felony-murder theory as a major participant who acted with reckless indifference to human life. Any error would be harmless.

17

DISPOSITION

The trial court's order denying defendant's section 1172.6 petition is affirmed.

                                          /S/
                                  MAURO, Acting P. J.

We concur:

      /S/
BOULWARE EURIE, J.

      /S/
MESIWALA, J.